IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy 21-22031-CMB |
| Akshita Banerjee, | ) | |
| | ) | (Chapter 13) |
| Debtor in Possession. | ) | |

-----------------------------------------------------------------

| | | |
|---|---|---|
| Sadis & Goldberg, LLP | ) | Adversary No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ELECTRONICALLY FILED** |
| Akshita Banerjee, | ) | |
| | ) | |
| Defendant. | ) | |

-----------------------------------------------------------------

## COMPLAINT OBJECTING TO DISCHARGE AND TO OBTAIN A DETERMINATION OF DISCHARGEABILITY OF DEBT

Sadis & Goldberg, LLP ("Sadis"), by and through its attorneys, for its Complaint objecting to the discharge of a particular debt owed to Sadis by Akshita Banerjee ("Mrs. Banerjee" or "Debtor") because the debt is for money obtained by actual fraud and Mrs. Banerjee made various misrepresentations in her petition and under oath and for a determination that assets not disclosed in Mrs. Banerjee's petition are not protected by any discharge, and related relief, states as follows:

1.      This Court has jurisdiction over this case under 28 U.S.C. §1334(b) and §157(b)(1) and 11 U.S.C. §§ 523 and 1328; this adversary proceeding is a core proceeding under 28 U.S.C. §157(b)(2).

2.       Venue for this adversary proceeding is appropriate in this Court because Mrs. Banerjee's bankruptcy case is pending before this Court pursuant to 28 U.S.C. §1409.

3.      On September 16, 2021, Mrs. Banerjee first filed her Voluntary Petition for Bankruptcy.

{00445351.DOCX; 1}

4.    On October 14, 2021, Mrs. Banerjee filed her full sworn Petition for Bankruptcy including Official Forms 106, 107, 108, and 122 (the "Petition").

5.    On November 24, 2021, Sadis filed Form 410, its Proof of Claim for the amount of $587,176.26, including the Judgment amount of $539,956 and interest of $37,722.95.  Sadis is a "creditor" within the meaning of 11 U.S.C. §101(10)(A).

6.    After numerous extensions, to allow for the production of documents and Mrs. Banerjee's 2004 examination, Sadis now brings this adversary proceeding to object to the discharge of Mrs. Banerjee's debt to Sadis and, at the very least, to seek a ruling that assets that Mrs. Banerjee has access to or regularly receives in the United States—but did not declare in her Petition—are not protected by any discharge and can still be collected on by Sadis.

I.    **SADIS PROVIDES $379,652 IN LEGAL SERVICES TO SUMANTA BANERJEE BUT HE REFUSES TO PAY**

7.    Plaintiff Sadis is a law firm and Limited Liability Partnership organized under Delaware law, authorized to do business in the state of New York, and whose principal place of business is 551 5th Avenue, 21st Floor, New York, New York 10176.

8.    Defendant Debtor, Mrs. Banerjee, is a citizen of Pennsylvania, with a residence of 1514 Cook School Rd., Pittsburgh, PA 15241.

9.    In March 2008, Mrs. Banerjee's husband, Sumanta Banerjee ("Mr. Banerjee") engaged Sadis to represent him in a lawsuit filed against Mr. Banerjee by his former employer, Tuckerbrook Alternative Investments, LP ("Tuckerbrook").

10.    Sadis provided legal services to Mr. Banerjee from March 2008 until June 2009, during which time Mr. Banerjee accumulated unpaid legal fees of $379,652.37.

11.    After various attempts to collect the unpaid balance, on October 18, 2013, Sadis filed a summons and complaint against Mr. Banerjee in the Southern District of New York

("SDNY") under Docket Number 13-cv-7355. Sadis later re-filed the action under Docket Number 14-cv-00913 on February 13, 2014 (the "SDNY Action"). The SDNY Action sought to collect the $379,652.37 owed, plus contractual interest at a rate of 1% a month (the "Original Debt").

12.     On February 6, 2015 the SDNY granted Sadis' motion for a default judgment and a judgment of $383,448.90 was entered on April 28, 2015.

13.     A year later, on April 27, 2016, Mr. Banerjee filed a motion to set aside the default judgment. Mr. Banerjee argued that he lived in India and was not properly served under the Hague Service Convention and had a meritorious defense. In support of his motion, Mr. Banerjee represented to the SDNY that he did not have any property in the United States, did not earn any income in the United States, and did not pay any State or local taxes.

14.     The SDNY denied Mr. Banerjee's motion, finding that he had been properly serviced and did not have a meritorious defense. Mr. Banerjee appealed to the United States Court of Appeals for the Second Circuit. On appeal, Mr. Banerjee advanced a new argument, claiming that he was a U.S. citizen domiciled in India in February of 2014 and therefore outside of the SDNY's subject matter jurisdiction.

15.     On March 22, 2018, the Second Circuit upheld the service on Mr. Banerjee and the validity of the default judgment, if there was subject matter jurisdiction. But the Second Circuit remanded to the SDNY to determine whether Mr. Banerjee was domiciled in Pennsylvania or India at the time the second Complaint was filed on February 13, 2014. The matter of Mr. Banerjee's domicile in 2014 in the SDNY Action is currently stayed pending the outcome of this proceeding.

## II.   SADIS DISCOVERS THE BANERJEES' FRAUDULENT TRANSFERS

16.     In various filings in the SDNY Action, Mr. Banerjee claimed to not have had any income in the United States in 2013 and 2014. But in 2019, through discovery related to the issue

of Mr. Banerjee's domicile, Sadis discovered that, contrary to Mr. Banerjee's representations

before the SDNY, the State of Pennsylvania's Department of Revenue believed that Mr. Banerjee

had earned $431,610 in 2014 and $108,346 in 2013 and had filed a tax lien for the income taxes

that Mr. Banerjee should have paid on that money.

17.     On February and March of 2019, Sadis took both Mr. Banerjee's and Mrs.

Banerjee's (together the "Banerjees") depositions.  At his deposition, Mr. Banerjee testified that

the $431,610 was money he earned from the sale of stocks and bonds in a fund called Common

Fund Distressed Partners II.  Ex. A at 269:2–8.  Mr. Banerjee similarly testified that $108,346 in

2013 was money he earned from the sale of stocks and bonds in a fund called Common Fund

Distressed Partners I in 2013.  *Id.* at 262:21–263:16.

18.     Mr. Banerjee further testified that the $431,610 was sent to him as a check in 2014

and he endorsed the check over to his wife, Mrs. Banerjee.  *Id.* at 269:9–270:4.  Mrs. Banerjee

similarly testified that Mr. Banerjee endorsed the $108,346 check over to her in 2013.  Ex. B at

86:20–24.  Mr. Banerjee received no consideration from his wife for these transfers.  These

transfers from Mr. Banerjee to his wife, occurring well after Mr. Banerjee was a debtor to Sadis,

were fraudulent transfers under New York and Pennsylvania law.

## III.    SADIS OBTAINS A JUDGMENT FOR FRAUDULENT TRANSFER AGAINST THE BANERJEES IN THE WDPA

19.     On December 31, 2019, Sadis filed an action in the United States District Court for

the Western District of Pennsylvania seeking recovery of the fraudulently transferred $431,610

and $108,346 against both Mr. and Mrs. Banerjee under Pennsylvania and New York law at Civil

Action No. 2:19-CV-01682 (the "WDPA Action").

20.     The Banerjees failed to respond to the complaint, and, on February 20, 2020, Sadis

obtained a judgment against the Banerjees for $539,956.00 plus costs (the "Judgment").

21.    On July 15, 2020, the Banerjees filed a Motion to Set Aside the Default claiming that they had never been served and were unaware of the WDPA Action until June 15, 2020.  But the Banerjees claim that they were never served was false.

22.    In addition to affidavits of service from the neutral process server showing personal service on Mrs. Banerjee on January 10, 2020, Mrs. Banerjee had left a voicemail for Sadis' counsel on January 31, 2020 requesting an extension to answer the WDPA Action Complaint—neatly demonstrating that she was fully aware of the WDPA Action.

23.    On July 28, 2020, in a Memorandum denying Defendants' Motion to Set Aside the Default Judgment, Judge Schwab found that the Banerjees failed to allege any meritorious defenses and highlighted "a pattern of tactics evidencing culpability of Defendants" and efforts to "shift assets in an attempt to become judgment proof."  *See* July 28, 2020 Memorandum Order Denying Motion to Set Aside Default Judgment in Case No. 19-CV-1682, a copy of which is attached hereto as Exhibit C, at 7-9.

24.    Despite the Judgment against them in the WDPA action and the District Court's denial of their Motion to Set Aside the Default, the Banerjees refused to pay their debt.

25.    Because the Judgment is for an intentional fraudulent conveyance—"actual fraud" under 11 U.S.C. § 523(a)(2)(A), it is not dischargeable in bankruptcy as a matter of law.

## IV.    SADIS DISCOVERS THAT THE BANERJEES FORMED THE SASB TRUST AND TRANSFERRED ASSETS INTO THE TRUST

26.    During discovery in the SDNY Action Sadis discovered that in or around May 2014, Mrs. Banerjee formed SSA Capital Advisors, LLC ("SSA Capital"), a Delaware limited liability company.  SSA Capital is a management company that Mr. and Mrs. Banerjee operate together managing various real estate investment businesses.

27.     On March 30, 2015, the Banerjees—together with a group of private investors—created SSA Capital Partners I, LLC which operated at least one mobile home park.  The SASB Trust was an investor in SSA Capital Partners I and numerous subsequent entities, including SSA Capital Partners II; SSA Capital Partners III GP, LLC; SSA Capital Partners IV, LLC; SSA Family Fund, LLC; SSA Capital Partners III Five Parks, L.P.; and SSA POH, LLC; among many others.

28.     SSA Capital was also an investor in at least SSA Capital Partners I and SSA Capital Partners II.  In addition SSA Capital was the management company for all of the various funds and earned management fees from them.

29.     In 2019 Sadis also discovered the existence of a trust, known as the SASB Trust, in the United States that was controlled by the Banerjees.

30.     On January 8, 2021, in an effort to enforce the Judgment and collect on the debt, Sadis filed a motion in the WDPA Action to impose a constructive trust on money flowing from SSA Capital to the Banerjees or to the SASB Trust for the benefit of the Banerjees (the "Enforcement Motion").

31.     In response to this motion and subsequent related filings the Banerjees revealed that they had formally formed the SASB Trust as The SASB Irrevocable Trust Dated June 14th, 2014 in June 2014, after Sadis filed the SDNY Action against Mr. Banerjee, naming Dr. Anant Gandhi ("Gandhi"), Mrs. Banerjee's father, as the Trustee.

32.     The formation of the SASB Trust in June 2014 occurred well after Mr. Banerjee became a debtor to Sadis and well after Mrs. Banerjee knew that Mr. Banerjee owed money to Sadis because she accepted service of the original Complaint in the SDNY Action in November of 2013.

33.     Any transfer of Mr. Banerjee's assets into the SASB Trust occurring after its formation was made for the purpose of hiding his assets from creditors and is a fraudulent transfer—including the transfer of any portion of the $539,956 that Mr. Banerjee earned in 2013 and 2014.

34.     On February 9, 2021, the Honorable Judge Schwab granted the Enforcement Motion and ordered a constructive trust "upon any and all payments" made from SSA Capital to the Banerjees or to the SASB Trust for the benefit of the Banerjees (the "Enforcement Order").  A copy of the Enforcement Order is attached hereto as Exhibit D.

35.     In the Enforcement Order, Judge Schwab wrote "[b]ecause this Court has found that Defendants have engaged in a 'pattern of willful defaults and fraudulent transfer of assets ... engaging in this purposeful course of evasion of its secured creditors' and 'continue(s) to improperly shift assets to avoid judgments' the imposition of a constructive trust on Defendants' interests in SSA Capital and the SASB Trust is within this Court's equitable powers and necessary to enforce this Court's Judgment."   Ex. D at 4 (internal citation omitted).

## V.    MRS. BANERJEE FRAUDULENTLY TRANSFERS HER COMPANY, SSA CAPITAL INTO THE SASB TRUST

36.     In subsequent filings in response to the Enforcement Motion, the Banerjees also claimed that although Mrs. Banerjee had once been the sole the member of SSA Capital, on January 1, 2019, Mrs. Banerjee had transferred her entire interest as managing member of SSA Capital to the SASB Trust.

37.     This claim however is contradicted by Mrs. Banerjee's March 20, 2019 deposition testimony in connection with the SDNY Action.  At her deposition, Mrs. Banerjee testified that SSA Capital is "just me."  Ex. B at 11:3-23.

38.     Further, on June 22, 2020, four months after the Judgment in the WDPA Action was entered against her, Mrs. Banerjee signed a Foreign Registration Statement with the Pennsylvania Department of State as the "Managing Member" of SSA Capital.  Ex. I at 2.

39.     Rather, sometime after June 22, 2020—well after the Judgment was made against them—Mrs. Banerjee transferred her interest in SSA Capital to the SASB Trust and, upon information and belief, backdated the documents in order to protect her business assets from collection. Mrs. Banerjee did not receive any consideration for this transfer.  This makes Mrs. Banerjee's transfer of her business a fraudulent transfer and further ineligible for discharge under 11 U.S.C. §523(a)(2)(A).

## VI.   DESPITE THE WDPA COURT IMPOSING A CONSTRUCTIVE TRUST, THE BANERJEES CONTINUE TO REFUSE TO PAY AND THE SASB TRUST IGNORED THE COURT'S RULING

40.     On February 12, 2021, Sadis served a copy of the Enforcement Order on Gandhi as the Trustee of the SASB Trust.  The letter attaching the Enforcement Order notified Gandhi that the Enforcement Order "imposed a constructive trust over any and all monies flowing to Sumanta Banerjee or Akshita Banerjee from SSA Capital … or the SASB Irrevocable Trust."

41.     On February 23, 2021, counsel for SSA Capital and the SASB Trust responded claiming that the Enforcement Order "does not impose a constructive trust over any and all monies flowing to Sumanta or Akshita Banerjee from the SASB Trust" but only "payments made by SSA Capital to the SASB Trust for the benefit of Sumanta or Akshita Banerjee."

42.     Additionally, counsel claimed that the Enforcement Order placed no restrictions on Gandhi's conduct in administering the SASB Trust because he was not a defendant in the WDPA Action and the SASB Trust was not under the WDPA's jurisdiction.

43.     In late February of 2021, Plaintiff discovered that SSA Capital and the SASB Trust had accounts with Bank of America.  Plaintiff sent a letter to Bank of America asking them to

freeze any flow of money from those entities to either of the Banerjees. Plaintiff subsequently

discovered that Akshita Banerjee also maintained an account with Bank of America and, on or

about March 5, 2021, served a writ of execution on Bank of America.

44.    However, Bank of America not only froze the accounts of SSA Capital, the SASB

Trust, and Mrs. Banerjee but they also froze the accounts of every entity for which Mrs. Banerjee

had the authority to withdraw money.  This included SSA Capital Partners I, LLC and SSA Capital

Partners III GP, LLC, SSA Family Fund, LLC and various other SSA entities (together the "SSA

Entities").

45.    On March 8, 2021, Steven Cherin, an attorney and investor with the Banerjees in

SSA Capital Partners I, LLC and SSA Capital Partners III GP, LLC, sent a letter asking Bank of

America to unfreeze accounts belonging to the SSA Entities.

46.    On or about March 9, 2021, Bank of America unfroze the accounts of the SSA

Entities but also unfroze Mrs. Banerjee's account. On information and belief, as soon as Mrs.

Banerjee's account was unfrozen she immediately transferred the funds in her account elsewhere

or out of her name.  By March 17, 2021 Mrs. Banerjees' Bank of America account was closed.

47.    The SASB Trust also closed its bank accounts both in the Bank of America and

elsewhere in March of 2021.

48.    On July 22, 2021, Sadis filed a new action against the SASB Trust, Gandhi, and

Mrs. Banerjee seeking to recover the fraudulent transfer from Mrs. Banerjee to the SASB Trust

and any subsequent transfer from the SASB Trust elsewhere.

49.    On August 4, 2021, the Court entered a temporary restraining order enjoining the

SASB Trust from further transferring or dissipating assets.  But before a preliminary injunction

hearing could take place, Mrs. Banerjee filed her original petition for bankruptcy and the WDPA

stayed the new action.

**VII.    MRS. BANERJEE MAKES FALSE STATEMENTS UNDER OATH IN HER PETITION, 341 MEETING, AND 2004 EXAMINATION ABOUT THE VALUE OF HER JEWELRY**

50.    In her Petition, Section 341 meeting, and Section 2004 meeting Mrs. Banerjee made

numerous false or misleading statements.  Because Mrs. Banerjee is attempting to procure a

Chapter 13 plan and discharge "through fraud," it must be denied under 11 U.S.C. §1328(e) and

11 U.S.C. §1330(a).

51.    For example, in her Petition, Mrs. Banerjee described her jewelry assets as

"Wedding ring; Watch; Costume Jewelry" with a value of "$5,000."  (Ex. E at 5.)  And during her

Section 341 meeting (starting at 33:05), Mrs. Banerjee testified that the wedding right was her

diamond ring and she valued it based on the purchase price in 2005.  Finally, in her Section 2004

examination, Mrs. Banerjee testified that she had not "sold off any jewelry in the past ten years."

Ex. F at 24:3-12.

52.    But in a previous filing in the SDNY Action, on February 5, 2021, Mrs. Banerjee

submitted an affidavit repeatedly citing an exhibit "6" that Mrs. Banerjee referred to as "a legally

binding contract called the Separation Agreement."   This Separation Agreement—attached hereto

as Exhibit G—listed the value of the property that Mrs. Banerjee was getting in the purported

separation, including the following items of the jewelry:

- Diamond Ring -3.0 carats, Three Stone Ring—Princess Cut: "Current Value: $100,000"

- Wedding Band, Diamond Band: "Current Value: $20,000"

- Gold Jewelry, Gold & Green Stone Necklace: "Current Value: $20,000"

- All Other Watches + Jewelry, Charriol Jewelry, Rolex Watch, Ladies Tag Watch "Current Value: $25,000"

53.     Thus in contrast to her Petition's claim that her jewelry is only worth $5,000, it was really worth $165,000.

54.     Therefore, in listing a value of her jewelry on her petition that was far lower than what Mrs. Banerjee knew her jewelry was really worth, Mrs. Banerjee "made a false oath or account" or "presented or used a false claim." *See* 11 U.S.C. § 727.  Thus, she is attempting to procure discharge of her debt by fraud.

## VIII.   MRS. BANERJEE MAKES FALSE STATEMENTS UNDER OATH IN HER PETITION, 341 MEETING, AND 2004 EXAMINATION ABOUT HER BUSINESSES AND EMPLOYMENT

55.     An even more egregious example of a false oath and account is how Mrs. Banerjee filled out Part 11 of Official Form 107 which requires her to "Give Details About Your Business or Connections to Any Business."  Ex. E at 29-30.  Section 27 of this part asks if "Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business? … A member of a limited liability company (LLC) or limited liability partnership (LLP) … An officer, director, or **managing executive** of a corporation … An owner of at least 5% of the voting or equity securities of a corporation."  *Id.* (emphasis added).  In her Petition, Mrs. Banerjee listed only one such business, SSA Capital and stated that the business existed from 2015-2019.  *Id.*

56.     Similarly, at her Section 341 Meeting (at 17:48), Mrs. Banerjee testified that she did not have any control over any entity in the last 5 years other than SSA Capital.  And that at the time she transferred SSA Capital to the SASB Trust it had no assets.  (*Id.* at 12:45, 29:15.) And that she only formed the other SSA entities as an "authorized signatory" as part of her self-employed property management work but had no position with those entities, and had no control position in those businesses.  (*Id.* at 22:25-23:05.)  Mrs. Banerjee also claimed that the SSA in SSA Capital Advisors and the other SSA entities did not stand for anything.  (*Id.* at 23:10-54.)

57.    These claims were inconsistent with prior testimony from Mrs. Banerjee in the SDNY Action and numerous official state filings.  For example, in her March 29, 2019 deposition, Mrs. Banerjee testified that the "SSA" from SSA Capital Advisors was "acronym" for her "children's names." Ex. B at 10:23-11:9.  And in an affidavit Mrs. Banerjee described to her tax communications about SSA Capital Partners I, LLC as containing "private information of my investors" and leading to assertions "about me, my business, my investors and my partners."  Ex. H at ¶34.  And in her 2004 Examination, Mrs. Banerjee testified that the "SSA" in both SSA Capital Partners I and SSA Capital Advisors "stands for [her] children's names," plainly contradicting her 341 Meeting testimony. Ex. F at 62:4-12.

58.    Additionally, Mrs. Banerjee conceded—contrary to her 341 Meeting testimony—that SSA Capital Advisors had equity in various other SSA Entities at the time it was transferred to the SASB Trust. *Id.* at 83:5-21, 90:7-91:5.

59.    Moreover, Mrs. Banerjee executed numerous official state filings listing herself as a manager or member of other SSA Entities.  For example, the 2019 Annual Statement filed for SSA Bellevue MHP, LLC ("SSA Bellevue") with the Michigan Department of Licensing and Regulatory Affairs ("LARA") lists Mrs. Banerjee as a "Member" of the entity.  Ex. J at 3.  And 2020 Annual Statement for the same entity lists Mrs. Banerjee as "Manager."  *Id.* at 1.  Yet Mrs. Banerjee did not list SSA Bellevue on her Petition.

60.    Similarly, the Application for Certificate of Authority to Transact Business in Michigan for SSA Bronson Manufactured Housing Park, LLC ("SSA Bronson"), filed on May 31, 2019, is signed by Mrs. Banerjee as "Manager."  *Id.* I at 6.   And the 2020 Annual Statement for SSA Huron MHP, LLC ("SSA Huron") filed with LARA also lists Mrs. Banerjee as "Manager" of that entity. *Id*. at 9.  Yet Mrs. Banerjee did not list SSA Bronson or SSA Huron on her Petition.

61.     At some point in 2020 or 2021, the Banerjees transferred over all of the assets of SSA Entities to new entities, each beginning with the word "Evergreen" (the "Evergreen Entities") and managed by a new entity Evergreen Parkes, LLC ("Evergreen Parkes").   Mrs. Banerjee testified that the investors in the Evergreen Entities are different than the investors in the SSA Entities, with Mrs. Banerjee being "the only one who's been consistent."[1]  Ex. F at 62:25-63:18. Mrs. Banerjee is also listed as Manager in state filings for various Evergreen Entities.

62.     For example, the March 2020 Application for Certificate of Authority to Transact Business in Michigan for Evergreen Pleasant Valley, LLC ("Pleasant Valley") is signed by Mrs. Banerjee as Manager.  Ex. K at 1-2.  Mrs. Banerjee is similarly listed as the Manager in the Michigan Applications for Evergreen Twin Meadows, LLC ("Twin Meadows").  *Id.* at 5-6.  Yet Mrs. Banerjee did not list Pleasant Valley or Twin Meadows on her Petition.

63.     At her Section 2004 Examination, Mrs. Banerjee also initially claimed that after she transferred SSA Capital to the SASB Trust—which she claimed occurred on January 1, 2019— her father, Gandhi took over as manager of SSA Capital and she became only an "authorized signatory" for SSA Capital and other SSA Entities.  Ex. F at 85:1-86:11, 116:18-118:6.  However, Mrs. Banerjee's own prior filings in the WDPA Action, stated that "[s]he remained the manager of SSA Capital" even after any such transfer.  WDPA Action Dkt. 51, ¶22.

64.     After counsel presented Mrs. Banerjee with government filing after government filing showing her to be a manager or member of various SSA Entities,[2] Mrs. Banerjee finally

---

[1] In reality, Mr. Banerjee, Steve Cherin, and Gandhi as the Trustee of a trust, have been consistently involved both before and after the transfer to the Evergreen Entities.

[2] Mrs. Banerjee first tried to claim that in Michigan "you cannot be an authorized signatory and filed anything" and that therefore they needed to put her down "as a manager, owner, owner/operator." Ex. F at 135:10-137:1.  However this claim was clearly false because from mid-2020 onward—after the Judgment was upheld by Judge Schwab—Mrs. Banerjee did indeed sign Michigan annual statements as "authorized signatory" or "authorized person."  Ex. K at 10, 14, 18.

admitted that she had in fact been the manager of the various SSA Entities—including SSA

Capital—until the Judgment was entered and upheld against her, stating:

> And because of the lawsuit that you filed saying of – you know, the issues, and you
> got a default judgment against me, that happened sometime mid-2020 … let's
> make a distinction, pre-lawsuit, default judgment, and post, okay? Pre, I was a manager
> to all those entities. As I filed it was correct. When the bank went back – the next
> transaction that happened, the bank said, oh my God, look, you've got a default
> judgment, you can't be a manager of anything. … You can only be an authorized
> signatory. Ex. F at 156:1-157:10.

65.    Mrs. Banerjee also admitted that the change in her title from manager to "authorized

signatory" was only cosmetic—nothing changed "in [her] actual day-to-day responsibilities." *Id.*

at 159:7-10.  And, indeed, with respect to at least one entity formed in 2022, Evergreen Keokuk,

LLC, Mrs. Banerjee was still listed as a "member/manager"—albeit under her maiden name,

Akshita Gandhi.  Ex. L at 1.

66.    In her Petition, 341 Meeting, and as much as possible in her Section 2004

Examination, Mrs. Banerjee has been attempting to portray herself as a self-employed property

manager making a meager living by managing other people's properties.  In reality, Mrs. Banerjee

and her husband, created and ran "a series of real estate businesses … under the umbrella **SSA**

**Capital Advisors,** based in a suburb of Pittsburgh."  Ex. M, December 1, 2021, Hedge Fund Alert

at 6.  SSA Capital and all of the SSA Entities were parts of Mrs. Banerjee's business together with

her partners and investors.

67.    Moreover, even after filing for bankruptcy, Mrs. Banerjee told a reporter in late

2021 that she and her husband were "raising capital" for a "commercial real estate investment

fund."  *Id*.  Indeed, Mrs. Banerjee and Mr. Banerjee both testified that they successfully worked

on securing significant investment in the SSA and later Evergreen Entities—including from

"Benedict Realty Group, also known as BRG Management, LLC."  Ex. F at 106:22-108:8; Ex. N

at 180:4-181:18, 189:24-191:19.   Another investor, the VGSB Realty Trust, for which Gandhi is the Trustee, is also an investor in the Evergreen Entities.

68.     As previously noted, the Evergreen Entities are managed by Evergreen Parkes. Mrs. Banerjee formed Evergreen Parkes in September of 2019.  Ex. O at 1-2.  On information and belief, upon formation SSA Capital had a majority interest in Evergreen Parkes and was the Managing Member.  Moreover, Mrs. Banerjee was still the owner of SSA Capital Advisors at the time—her transfer of SSA Capital Advisors to the SASB Trust really took place after the Judgment and, upon information and belief, was backdated—and managed Evergreen Parkes and by extension the Evergreen Entities together with her husband.

69.     Mrs. Banerjee testified that SSA Capital is in the process of being dissolved.  Ex. F at 64:24-65:3.  On information and belief, the Banerjees continues to operate their real estate fund empire through a new entity or entities.

70.     Mrs. Banerjee is certainly not just a property manager. Rather she operated and continues to operate a sophisticated investment business through entities she controls on a day to day basis.  Indeed, even in downplaying her role with the SSA Entities and Evergreen Entities, Mrs. Banerjee conceded "I think my senior advisor role supersedes my property manager role." *Id*. at 209:7-14, 210:4-18 (agreeing that it is "fair to say" that she is "a senior advisor to the Evergreen entities" and was "a senior advisor to the SSA entities").

## IX.     MRS. BANERJEE'S PETITION FAILS TO REPORT THE FAMILY SUPPORT SHE RECEIVES FROM HER FATHER AND HER HUSBAND'S FAMILY

71.     Mrs. Banerjee's Petition also contains a material misstatement with respect to the support she receives from her family.  In her Petition (Ex. E at 6, ¶29) Mrs. Banerjee states that she does not receive any family support.  But in her 2004 Examination she admitted that her father gives her money.  Ex. F at 39:17-21.

72.     Moreover, Mrs. Banerjee admitted that she and her husband have received funds from her "husband's family trust" for lawyer fees. *Id.* at 39:23-40:8. And, indeed, Mrs. Banerjee's bank statements show her account receiving thousands of dollars from her husband's family trust in India. *E.g.*, *id.* at 223:8-23. Because Mrs. Banerjee did not report these sources of funds as assets or income on her Petition, they are not being administered by the Court and they should be outside the scope of any payment plan or discharge awarded by this Court.

73.     Not only did Mrs. Banerjee not report the money she received from her father and husband's family in her Petition but she also improperly listed her father as a creditor in the Petition. Mrs. Banerjee listed her father, Gandhi, as a creditor in the amount of $145,000. Ex. E at 14. Although a portion of that is related to the purchase of the land for house, the rest is just support that Gandhi has given his daughter over the years. Ex. F at 46:14-47:16. Mrs. Banerjee does not know exactly how much money Gandhi has given here, and there is "no paper" with the terms of the "loan." *Id.* Merely naming a gift as a "loan" does not make it so. Debt to Gandhi should not be included in any payment plan.

## COUNT I

## OBJECTION TO DISCHARGE OF THE JUDGMENT DEBT UNDER 11 U.S.C. § 523(a)(2) AND §1328(a)

74.     Sadis restates and incorporates by reference each of the allegations stated above, as if fully stated herein.

75.     Mrs. Banerjee's debt to Sadis is as a result of an intentional fraudulent transfer which resulted in the Judgment. The Honorable Judge Schwab found that Mr. and Mrs. Banerjee "engaged in a pattern of willful defaults and fraudulent transfer of assets" which was part of "this purposeful course of evasion of its secured creditors."

76.    Judge Schwab also found that Sadis was legitimately concerned that the Banerjees would "continue[] to improperly shift assets to avoid judgments."  And indeed that is exactly what Mrs. Banerjee did.  Faced with the Judgment against her, she transferred her business, SSA Capital—including the equity that SSA Capital had in various SSA Entities and Evergreen Parkes—into the SASB Trust and, upon information and belief, falsely backdated the documents.

77.    Upon information and belief, after the SASB Trust was named in a lawsuit, Mrs. Banerjee arranged for the SASB Trust to further fraudulently transfer its assets to a new trust or other entities to further protect her assets from collection.

78.    Therefore, Mrs. Banerjee's debt to Sadis is not dischargeable under 11 U.S.C. § 523(a)(2)(A) as it is "for money … obtained by … actual fraud."  *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 359 (2016) ("The term "actual fraud" in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."). And under 11 U.S.C. §1328(a)(2), debts of the kind specified in §523(a)(2) are not dischargeable in Chapter 13 cases.

## COUNT II

## OBJECTION TO DISCHARGE OF THE JUDGMENT DEBT UNDER 11 U.S.C. §1328(e) AND 11 U.S.C. §1330(a)

79.    Sadis restates and incorporates by reference each of the allegations stated above, as if fully stated herein.

80.    Mrs. Banerjee's Petition was filed in bad faith and Mrs. Banerjee is attempting to procure discharge of her debt to Sadis by fraud.

81.    Mrs. Banerjee's debt to Sadis is as a result of an intentional fraudulent transfer which resulted in the Judgment. Faced with the Judgment against her, she transferred her business,

SSA Capital—including the equity that SSA Capital had in various SSA Entities and Evergreen

Parkes—into the SASB Trust and, upon information and belief, falsely backdated the documents.

82.     Mrs. Banerjee also made false claims, under oath, in her Petition. She understated

the value of her jewelry by 3,300%, claiming her $165,000 in jewelry was only worth $5,000.

83.     Mrs. Banerjee also falsely claimed to only own, control, or be a managing executive

in one entity in the last 4 years, SSA Capital—which she claimed ended in 2019.  In reality she

was a manager or member of over a dozen entities and remained a manager of SSA Capital until

at least mid-2020, when the Judgment was upheld by the WDPA.

84.     Moreover, she falsely claimed under oath at the Section 341 Meeting—and initially

in her Section 2004 Examination—that she was only an authorized signatory for these entities and

was only a property manager.  In reality, she was the manager of these entities and was one of the

primary people operating a real estate investment business—even after she changed her nominal

designation to "authorized signatory"—first under the umbrella of SSA Capital and later under the

umbrella of Evergreen Parkes.

85.     Mrs. Banerjee also falsely claimed in her Petition not to be receiving family support

and designated her father as a creditor for $145,000 when all or part of that money was really a

gift.

86.     These misrepresentations in her Petition, 341 Meeting, and 2004 Examination are

"a false oath or account" and "a false claim" under 11 U.S.C. §727(a)(4).  Mrs. Banerjee's attempts

to use these false oaths and claims to gain discharge of her debt to Sadis is an attempt to obtain

discharge "through fraud" under 11 U.S.C. §1328(e)(1) and to procure confirmation of a plan "by

fraud" under 11 U.S.C. §1330(a).

<u>**COUNT III**</u>

<u>**REQUESTING THE COURTS NOT DISCHARGE THE DEBT WITH RESPECT TO
ASSETS THAT WERE NOT DISCLOSED ON THE PETITION, ARE NOT
ADMINISTERED BY THE COURT, ARE NOT IN MRS. BANERJEE'S PERSONAL
NAME, OR ARE OUTSIDE THE UNITED STATES**</u>

87.     Sadis restates and incorporates by reference each of the allegations stated above, as if fully stated herein.

88.     At the very least, Mrs. Banerjee claims that she transferred SSA Capital to the SASB Trust and that she no longer has any control over SSA Capital, its assets, or the assets of the SASB Trust—and certainly not over any entity that has since received those assets.  Therefore any payment plan and discharge must not include those assets.

89.     Similarly, Mrs. Banerjee does not include funds held by her father, in her husband's family trust, or in the accounts or possession of some other entity as part of the Bankruptcy estate in her Petition.  As such, any such assets are excluded from any discharge order.

**WHEREFORE**, Sadis objects to any discharge of the Judgment and any plan that does not include a full and immediate repayment of the Judgment, and respectfully requests that this Honorable Court enter judgment declaring that pursuant to Section 523(a)(2)(A), Sections 1328(a) & (e), Section 1330, and Section 727(a)(4) of the Bankruptcy Code.  Debtor's debt to Sadis in the total amount of $539,956—plus interest accruing at a rate of 6% per year since February 20, 2020—is not dischargeable in this or any future bankruptcy case filed by Debtor, and awarding Sadis its attorneys' fees and costs incurred in bringing this action, and grant any such further relief as this Court deems just and proper.

In the alternative, to the extent this Honorable Court does discharge any debt, Sadis respectfully requests that any Discharge Order specifically provide that assets not included in

Debtor's Petition, were not administered by this Court, are being held in the name of someone else

or some other entity, or are outside the United States are excluded from discharge.

Dated: January 31, 2023

*/s/ Ben Hutman*
By: Ben Hutman (admitted pro hac vice in
Main Case, and application for pro hac vice
admission pending for this adversary
proceeding)
Sadis & Goldberg, LLP
551 Fifth Avenue, 21st Floor
New York, New York 10176
Telephone:  (212) 947-3793
Email:  bhutman@sadis.com

*/s/ Gary M. Sanderson*
Meyer, Unkovic & Scott LLP
Gary M. Sanderson, Esquire
Pa. I.D.  #313591
gms@muslaw.com
535 Smithfield Street, Suite 1300
Pittsburgh, Pennsylvania 15222-2315
TEL:  (412) 456-2800

Attorneys for Creditor Sadis & Goldberg, LLP

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 31st day of January, 2023, I electronically filed and served the foregoing COMPLAINT OBJECTING TO DISCHARGE AND TO OBTAIN A DETERMINATION OF DISCHARGEABILITY OF DEBT using the CM/ECF system, which shall provide notice to all parties and counsel of record electronically, and a courtesy copy has been further served by U.S. Mail on counsel for the Debtor/Defendant and the United States Trustee, as follows:

John Lacher, Esquire
The Lynch Law Group
501 Smith Drive, Suite 3
Cranberry Twp., PA 16066

Ronda J. Winnecour, Esq.
Suite 3250, USX Tower
600 Grant Street
Pittsburgh, PA 15219

Office of the United States Trustee
Liberty Center
1001 Liberty Avenue, Suite 970
Pittsburgh, PA 15222

Dated: January 31, 2023

*/s/ Ben Hutman*
By:  Ben Hutman (admitted pro hac vice in Main Case, and application for pro hac vice admission pending for this adversary case)
Sadis & Goldberg, LLP
551 Fifth Avenue, 21st Floor
New York, New York 10176
Telephone:  (212) 947-3793
Email:  bhutman@sadis.com

{00445351.DOCX; 1}